UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
CRIMINAL NO. 11-381 (SRN/JJG)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **THIRD SUPERSEDING** |
| | ) | **INDICTMENT** |
| Plaintiff, | ) | |
| | ) | 18 U.S.C. § 2 |
| v. | ) | 18 U.S.C. § 1341 |
| | ) | 18 U.S.C. § 1343 |
| ROBERT ALLEN WALKER, | ) | 18 U.S.C. § 1349 |
| | ) | 18 U.S.C. § 1512(b)(1)) |
| Defendant. | ) | 26 U.S.C. § 7201 |

THE UNITED STATES GRAND JURY CHARGES THAT:

## <u>INTRODUCTION</u>

At times relevant to this Third Superseding Indictment:

1.     From approximately 2001 through May 2011, defendant ROBERT ALLEN WALKER (hereinafter "WALKER"), a Minnesota resident, was the President, Chief Executive Officer, and Chairman of the Board of Directors of Bixby Energy Systems, Inc. ("Bixby").

2.     Bixby was a privately-held Delaware corporation with its principal places of business in Minnesota owned by approximately 1,800 shareholders located throughout the United States.

3.     Bixby's primary business was the development of alternative energy projects, including a biomass stove whose primary fuel was corn, and a coal gasification system.


SCANNED
OCT 2 3 2013
U.S. DISTRICT COURT MPLS

U.S. v. Robert Allen Walker                                    Criminal No. 11-381 (SRN/JJG)

4.     Dennis Desender, acting in concert with WALKER and others, raised money from investors on behalf of Bixby.   At various times, Desender described himself or was described by Bixby employees as the Chief Financial Officer of Bixby and an Independent Financial Consultant to Bixby.

5.     Global Partners United, LLC ("GPU"), was a limited liability company that contracted with Bixby to license, sell and distribute Bixby's coal gasification system to GPU's various Chinese clients, who provided funding to Bixby to produce a coal gasification system and liquefaction system which WALKER falsely represented had already been fully developed.

## COUNTS 1 - 13
### (Mail Fraud (Counts 1-4) and Wire Fraud (Counts 5-13))
### 18 U.S.C. § § 1341 and 1343

6.     From in or about 2001 through in or about August 2013, in the State and District of Minnesota and elsewhere, the defendant,

### ROBERT ALLEN WALKER,

aiding and abetting and aided and abetted by Dennis Desender and others known and unknown to the Grand Jury, engaged in mail fraud and wire fraud by devising and intending to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises and concealment and omission of material facts, and knowingly:

2

a.     caused the sending, delivering, and moving by the United States Postal Service and interstate commercial carrier of various mailings for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Sections 2 and 1341; and

b.     transmitted and caused the transmission in interstate commerce, by means of wire communications, certain signals and sounds, for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Sections 2 and 1343.

## SCHEME AND ARTIFICE TO DEFRAUD

7.     Between 2001 and May 2011, WALKER and others raised more than $57 million from approximately 1,800 victim-investors and approximately $4.5 million from GPU's Chinese customers, by making repeated, material misrepresentations of facts and by omitting and concealing material facts, as described below.

8.     It was part of the scheme and artifice to defraud that WALKER greatly exaggerated his business acumen and expertise, and gained the confidence of the victim-investors, by asserting that he founded Select Comfort and invented its signature product, the Sleep Number Bed, but then falsely claiming credit for the financial success and the public offering of Select Comfort stock by misleadingly concealing from the victim-shareholders that venture capitalists assumed control over Select Comfort; took Select Comfort public; and made it into a successful company many years after WALKER had left Select Comfort.

9.     It was part of the scheme and artifice to defraud that WALKER concealed from the victim-investors that he intended to and did treat Bixby as though it were his own private asset – in effect, as though Bixby's funds were his own funds, to spend on himself and members of his family as he saw fit – and that WALKER intended to and did marginalize, manipulate, withhold information from, and inappropriately control the Bixby Board of Directors, which WALKER knew had a fiduciary duty to represent and protect the interests of the victim-shareholders he and his accomplices tricked into capitalizing Bixby.

10.     It was part of the scheme and artifice to defraud that, although WALKER knew that Desender had a significant criminal history, WALKER concealed this material fact from Bixby's prospective shareholders and from Bixby's Board of Directors because of Desender's considerable talent at raising money for Bixby; Desender's willingness to raise money for Bixby using materially false information about Bixby's business prospects; and Desender's willingness to tolerate WALKER's misuse of Bixby's funds for WALKER'S own benefit and for the benefit of the Walker family.

11.     Desender started working for Bixby in about 2001, and except for the period beginning in or about July 2006 (when WALKER "fired" Desender after Desender's criminal past became known to the Bixby Board of Directors) through in or about January 2007 (when, after removing the Bixby Board of Directors, WALKER brought Desender back into Bixby), Desender continued working for Bixby in various capacities until about

2011. Desender's primary responsibilities included introducing potential investors to Bixby, soliciting potential investors on behalf of Bixby, and acting as the Chief Financial Officer of Bixby.

## 2001 - 2006

12.     In about 2001, WALKER and others formed Bixby and, through Bixby, developed and marketed a corn-burning stove. In or about July of 2001, Bixby established a Board of Directors which had a fiduciary responsibility to Bixby shareholders to oversee the business operations of Bixby and to protect shareholders' equity in Bixby.

13.     Shortly after Bixby was founded, WALKER and others working in concert with WALKER began raising money on behalf of Bixby.

14.     WALKER and other Bixby representatives, including Desender, met with potential investors and, in order to convince them to invest money in Bixby, described Bixby's business and its future prospects.

15.     Beginning in about 2001 and continuing until about 2011, Bixby unlawfully offered and paid commissions to individuals (whom WALKER called "finders") who introduced potential investors to Bixby and/or solicited investments on behalf of Bixby. During this period, Desender was Bixby's principal money-raiser.

16.     WALKER knew that United States securities laws imposed three basic limitations on soliciting investors for Bixby using finders:

5

(a)     First, "finders" were prohibited both from receiving "transaction-based" compensation (that is, a fee determined as a percentage of the total sales price of the Bixby stock purchased by the investor) for bringing investors to Bixby and from providing substantive reasons to convince investors to invest in Bixby.  Put differently, "finders" were required to limit themselves merely to identifying to Bixby persons who might wish to invest in Bixby and to receiving flat fees unrelated to how much money was raised from persons they identified to Bixby.   WALKER knew that Bixby's "finders" were not legally permitted to "pitch" Bixby as a good investment, or to receive transaction-based compensation, without becoming "unregistered broker/dealers," a status forbidden by United States Securities Laws (the "Finders Rule"); and

(b)   Second, United States Securities Laws limited, in some cases, WALKER and his accomplices to soliciting only persons who, by dint of a net worth of more than $1 million, or annual income of more than $200,000, were more able to assess and absorb losses from the investment in Bixby than people of scarcer means and less sophistication, persons called "accredited investors" (the "Accredited Investors Rule"); and

(c)   Third, WALKER knew that United States Securities Laws prohibited the use of "general solicitations" to attract investors to Bixby (the "General Solicitation Rule"). A "general solicitation" is essentially an advertisement to a target audience with which the issuer (in this case, Bixby) making the solicitation has no preexisting relationship.

U.S. v. Robert Allen Walker                                    Criminal No. 11-381 (SRN/JJG)

It was part of the scheme and artifice to defraud that WALKER knew that he and "finders" working for Bixby did not comply with the Finders Rule and the Accredited Investors Rule but rather focused at all times on only one goal: raising money from any investor, regardless of net worth, including through finders who pitched Bixby as a good investment and received transaction-based compensation for doing so and who thus acted unlawfully as unregistered broker/dealers.

It was further part of the scheme and artifice to defraud the WALKER repeatedly violated the General Solicitation Rule by, among other means, using the high-quality video described in paragraph 37 below to attract new investors to Bixby, even though at least two attorneys working for Bixby warned WALKER that doing so violated United States Securities Laws both because it was it was a general solicitation and because the content of the video was misleading.

### Misrepresentations and Omissions Regarding Commission Payments

17.     The private placement memoranda misrepresented to potential investors that Bixby's officers and directors, which included WALKER and his daughter, MB, would not receive a sales commission from the sale of Bixby stock.

18.     Beginning in about 2001 and continuing until about 2006, in addition to a monthly fee, Bixby agreed to pay Desender a commission equal to approximately 10 percent of the amount invested by individuals who were purportedly introduced to Bixby

7

by Desender.  In total, Bixby paid Desender more than $2.4 million in commission payments and consulting fees between 2001 and 2006.

19.    Beginning in about 2004 and continuing until about 2006, WALKER solicited and received more than $600,000 from Desender in secret, commission-sharing kickback payments.   WALKER concealed his receipt of these payments from victim-shareholders and from the Bixby Board of Directors because he knew that he was prohibited from receiving them under the terms of the private placement memoranda through which he had solicited investor funds and because he never intended to and never did pay income tax on this income.

### Commercially Unreasonable Nepotistic Remuneration
### to Walker Family Members

20.    From 2001 through 2006, WALKER caused Bixby to employ several members of his family, including his wife, JW; his daughter, MB; and his son-in-law, JB; in capacities for which they were not qualified, and to perform services not genuinely needed by Bixby, and caused Bixby to pay these Walker family members victim-shareholder funds in commercially unreasonable amounts despite objections lodged with WALKER from time to time by certain Bixby shareholders, directors, employees, Desender and others.  In addition, WALKER's daughter, MB, who was in charge of Bixby's payroll, materially overpaid herself and sometimes paid herself more than once for a given pay period.

21.   Similarly, WALKER's daughter, MB, at times an officer or employee of Bixby, received an aggregate of approximately $330,449 in commissions for selling Bixby stock which she was prohibited from receiving under the terms of the private placement memoranda under which the stock was sold.   In addition, WALKER caused Bixby to pay JB, MB's husband, $266,000 in commissions concealed from the victim-shareholders as "consultant fees" and an additional $74,000 in commissions characterized on Bixby's books as "additional paid-in capital."

22.   In addition, from 2001 through 2006, WALKER caused Bixby to issue "warrants" – essentially options to purchase stock in Bixby – to his daughter MB and to her husband, JB, from which they derived hundreds of thousands of dollars of benefit.

23.   WALKER also provided MB with a "noncompete" agreement from which MB derived significant benefit in the form of Bixby warrants, even though MB had no ability to compete with Bixby.

24.   In addition, WALKER and MB submitted numerous claims for reimbursement to Bixby for business expenses they claimed to have incurred on behalf of Bixby.   From 2001 through 2011, WALKER and his family members caused Bixby to pay them more than $1.8 million in "reimbursements" for out-of-pocket expenses they claimed to have paid, even though, in many cases, they provided no back-up for these purported expenses, and, in some cases, the expenses were clearly incurred to pay private debts of, or to purchase private assets for, WALKER and MB.

25.     From 2001 through 2011, WALKER caused Bixby and victim-shareholders to pay himself, his family members, and Desender more than $8 million, enabling WALKER and his daughter MB to maintain lavish lifestyles and large residences in Ramsey, Minnesota.

### The 2006 Audit

26.     In about 2006, and over WALKER's objections, the Bixby Board of Directors, after discovering certain of the inappropriate payments made by Bixby to WALKER, MB and his other accomplices, retained a forensic auditing firm and a prestigious Minneapolis law firm to examine the extent of the financial improprieties that had occurred under WALKER's tenure from 2001 through 2006.  During the ensuing audit process, the auditors discovered, among other improprieties, the kickback payments made by Desender to WALKER; the inappropriate payments and other unreasonable remuneration paid to members of WALKER's family; the repeated violation by WALKER and his accomplices of both the Finders Rule and the Accredited Investors Rule; and further discovered that Bixby had paid Desender approximately $700,000 more than Desender was owed based on a 10 percent commission rate.

27.     On or about December 28, 2006, when confronted by the attorneys hired by the Bixby Board of Directors regarding the kickback payments, WALKER falsely characterized the kickback payments as "loans" from Desender to WALKER.

28.    In or about late 2006, in order to conceal from the victim-shareholders, the Bixby Board of Directors, and the Internal Revenue Service, that he had illicitly received victim-shareholder funds of approximately $600,000 in violation of the terms of the private placement memoranda, WALKER fabricated and backdated documents, including a purported loan agreement, in an attempt to substantiate his false claim that the payments were loans from Desender to WALKER.

29.    In or about late December 2006, WALKER informed Desender that the Bixby Board of Directors was "closing in" on them regarding their illicit kick-back arrangement.   In order to prevent his improprieties from being further documented, substantiated and disclosed to the victim-shareholders, and to prevent his ouster from Bixby, which WALKER knew was imminent, WALKER, Desender and others working in concert with them purportedly obtained proxy votes from more than 50 percent of Bixby's victim-shareholders authorizing the removal of AA and WK from the Bixby Board of Directors, whom WALKER replaced with directors who were not aware of the negative audit findings.

**2007- May 2011**

30.    Shortly thereafter, with the original Bixby Board of Directors dismantled, WALKER terminated the forensic audit of Bixby, although it had already resulted in a draft report describing serious misuse of victim-investor funds by WALKER, and concealed such findings from Bixby's new Board of Directors; to the then-current Bixby

11

victim-shareholders; or to any of the many victim-shareholders of Bixby that WALKER and his accomplices solicited for investments from 2007 through May 2011.

31.     In or about 2007, WALKER recruited KC, JB and GG to serve on the Bixby Board of Directors but withheld material information from them about his abuses of Bixby funds, thus undermining the new Board of Directors' ability to discharge its fiduciary duties to the victim-shareholders and allowing WALKER to continue to use Bixby to enrich himself and his family.

## Misrepresentations and Omissions To Investors
## Regarding the Coal Gasification System

32.     In or about 2007, WALKER, now deprived of the kickbacks from Desender, solicited and received from the new Board of Directors a substantial salary increase to over $300,000 annually, an amount he justified based upon revenues generated by the sales of corn-burning stoves which were materially inflated.  Furthermore, after securing his salary increase based upon fictitious sales of the corn-burning stoves, WALKER caused Bixby to abandon the corn-burning stove business and converted Bixby into a research and development company to develop the purported coal-gasification technology discussed below.

33.     Beginning in or about 2007 and continuing until about 2011, WALKER began making serial, material misrepresentations in numerous media (including in in-person meetings with prospective investors)  about a "coal gasification" technology

12

which Bixby was attempting to develop to attract new investors to Bixby and to lull Bixby's existing investors into keeping their money invested in order to protect his substantial salary and his continued use of Bixby victim-shareholder funds to enrich himself and members of his family.   These media included private placement memoranda; a shareholder newsletter called "The Bixby Blaze," which contained propaganda materials written principally by WALKER; letters to shareholders written and approved by WALKER; and innumerable emails personally written by WALKER both to persons contemplating investing in Bixby and persons who already had invested in Bixby.   In general, in all of these media, WALKER repeatedly misrepresented that Bixby had *already accomplished* what he well knew were merely Bixby's and WALKER's aspirations and hopes regarding the coal gasification technology, which had not been and never were realized.

34.    Bixby's "coal gasification" system purportedly consisted of two separate technological processes.   First, a process called "devolitization" purportedly involved heating (but not burning) coal in order to produce natural gas.   The devolitization process generated a carbon, or coke, byproduct.   Second, a process called "liquefaction" purportedly involved using hydrogen to convert the carbon/coke byproduct of the devolitization process into sweet, light crude oil or jet fuel.

35.    Between 2007 and May 2011, WALKER knowingly and repeatedly made false material statements regarding the "devolitization" process, as follows:

- WALKER represented, knowingly and repeatedly, that the devolitization process produced natural syngas of "pipeline quality" when, in fact, the Bixby devolitization process, even only on the small scale to which it was developed, did not produce gas of such quality;

- WALKER represented, knowingly and repeatedly, that the devolitization process produced carbon that was "fully activated" and thus highly marketable when, in fact, WALKER was well aware that, at best, the devolitization process produced carbon which *could be* made into fully activated carbon using additional technologies not part of the devolitization process which involved additional, undisclosed expenses; and

- WALKER represented, knowingly and repeatedly, that Bixby had a vetted and proven devolitization process and was capable, with funding, of creating a commercially viable, commercial-scale devolitzation machine which would revolutionize the alternative-energy market when, in fact, Bixby had only produced a small, quarter-scale unit referred to as "Coal Jr.," (which itself did not work as described by WALKER) and WALKER had no basis to know whether Bixby had the ability to scale it up to full commercial specifications; and

- WALKER concealed the fact that, during the period from 2008 through June 2010, Bixby produced several iterations of its devolitization machine, each

14

of which had technical issues which prevented it from operating as WALKER repeatedly described to the victim/investors.

36.    Between 2007 and May 2011, WALKER knowingly and repeatedly misrepresented to the victim/shareholders that Bixby had developed a proven liquefaction process which could dramatically transform oil-importing countries into oil-exporting companies when, in fact, Bixby had no proven liquefaction process and never produced anything more than a "bench unit" liquefaction machine which produced, at most, small amounts of oil.

37.    In approximately late August 2008, WALKER began using a high-quality, high-production-value video (for which WALKER caused Bixby to pay over $250,000 in victim-investor funds) which claimed that Bixby's coal gasification system and its liquefaction system were ready "now" to revolutionize the alternative energy industry both to lull the then-existing Bixby victim-investors into inaction and to attract new victim-investors to Bixby, even though counsel to Bixby warned WALKER not to do so and even though WALKER well knew that the video presented as having already been accomplished merely what Bixby aspired to but never did accomplish with respect to the Bixby coal-gasification system.

38.    In or about April 2010, WALKER gave a public speech in London, England at which he falsely claimed that Bixby had secured billions of dollars in actual orders from Chinese customers for Bixby's coal-gasification machines and an additional $1.3 billion

order for coal-gasification machines from a purported Canadian customer.  He further represented that Bixby's devolitization machines had been commercially functional for "several" years, when he well knew that the machines suffered from major defects which prevented them from working as represented by WALKER.

39.     Between December 2009 and June 2010, Bixby attempted unsuccessfully to "scale up" Coal Jr., a "quarter scale" unit, into a full-sized commercial devolitization machine.  In or about June 2010, WALKER knew that the fabricator Bixby hired to manufacture the full-sized commercial machine had failed to do so.  WALKER knew the machine did not work. On or about June 28, 2010, WALKER sent an email to the fabricator stating that WALKER was "so upset that I am ready to spit acid" because "that damn unit is still sitting there because you can't get it to work properly."

40.     It was part of the scheme and artifice to defraud that, despite knowing very well that Bixby had failed to create a commercial devolitization unit that worked properly, WALKER caused Bixby to issue a press release on June 28, 2010 (the same day as the email to the fabricator) which stated:

> A revolutionary process that efficiently converts coal into clean burning energy has been developed and is commercially available from Bixby Energy Systems, Inc., a Minneapolis-based new-energy technology development company.

As WALKER well knew, this public statement was materially false.  In fact, shortly after the issuance of the press release, WALKER hired a new fabricator to attempt to build the devolitization machine essentially from scratch.

41.    In soliciting money from investors during the period 2007 through 2011, WALKER concealed the material fact that his continuing misuse of Bixby funds made it impossible at times to pay the engineers and fabricators Bixby hired to try to develop the coal-gasification system and that by approximately early October 2010, even the newly-hired engineers and fabricators working on the redesigned Bixby coal-gasification system had suspended their work for nonpayment.

42.    From at least as early as 2004 through May of 2011, and to catalyze investor interest in investing in Bixby, WALKER repeatedly misrepresented to shareholders and prospective shareholders alike that Bixby was on the cusp of "going public" – that is, that its stock would soon be traded on a public exchange, an event that would purportedly be wealth-creating for Bixby shareholders – even though he knew that "taking Bixby public" would have required victimizing the investing public with the same fraudulent information WALKER used to induce individual investors to invest in Bixby and that "taking Bixby public" without committing a massive fraud on the investing public was flatly impossible.

43.    For example, on or about December 9, 2008, at a meeting of approximately 15 prospective investors that occurred at a private residence located in Bayport, Minnesota, defendant WALKER falsely represented that Bixby stock available for $4 per share would appreciate to at least $40 as the result of a public offering of Bixby stock which, he represented, would occur within two months of the meeting.

## Misrepresentations To GPU's Chinese Clients

44.     In order to raise more money for Bixby, and to protect WALKER's salary and the continuing largesse flowing from Bixby to his family, WALKER made repeated, material misrepresentations to GPU's clients mediately through GPU.  By way of example but not of limitation, in August of 2009, WALKER traveled to China at GPU's behest and gave a speech GPU's Chinese clients in which he made the following representations, all of which he well knew were materially false when made:

- WALKER represented that Bixby's devolitization process was a "fully developed technology" that had been operating for "several years" and that Bixby could have fully-scaled up, functional, commercial devolitization machines in boats headed to China within 60 days, even though Bixby had not and never did develop a commercial-scale devolitization machine that worked;

- WALKER represented that the devolitization process produced fully-activated carbon, whose porosity could be "dialed in" using Bixby's technology, even though WALKER knew, and acknowledged to his coconspirators, that Bixby's carbon, in the form it came out of the Bixby devolitization machine, was useless; and

- WALKER represented that Bixby's liquefaction process would be made available to GPU's Chinese clients within a short period of time after

receiving the devolitization machines, even though Bixby had not yet developed any liquefaction technology which could make even a cup of oil.

## Marginalizing Bixby's New Board of Directors

45.    In 2011, WALKER attempted to control the Bixby Board of Directors by withholding material information from the Bixby Board of Directors about his misrepresentations regarding Bixby's technology.   However, two members of the Bixby Board of Directors – GG and JB – learned of WALKER's misrepresentations to Bixby's victim-shareholders and to GPU's Chinese clients and began to take steps to control WALKER; to end his abuse of Bixby; and ultimately to oust him.

46.    WALKER responded by withholding information directly requested by GG and JB, including the identities of Bixby's shareholders; by cancelling meetings of the Board of Directors; by accusing the Bixby Board of Directors of "meddling" with Bixby's affairs; and by declining to hold meetings of shareholders at which the membership of the Bixby Board of Directors should have been determined.

47.    In or about April and May 2011, under tremendous pressure resulting from a lawsuit brought by GG and JB against WALKER in Minnesota effectively calling for his ouster from Bixby, WALKER engaged in a fraudulent scheme to remove GG and JB from the Board of Directors, an action that could legitimately be undertaken only by the victim-investors, which involved the following steps:

- On or about April 15, 2011, WALKER caused a purported Filipino entity called Manna Assets Management LTD ("Manna") to subscribe to the purchase of $100,000,000 worth of Bixby "Class C preferred stock" entirely on credit – that is, without paying anything for such shares;

- On or about April 21, 2011, WALKER caused the Bixby Board of Directors to retroactively authorize the issuance of the "Class C preferred stock" in a "Written Action of the Board of Directors of Bixby Energy Systems" signed by WALKER, KC and PW (but without consulting JB and GG); and

- On or about April 21, 2011, WALKER caused Manna to vote its stock to oust GG and JB without consulting with or notifying any of the Bixby victim-shareholders.

48.     On or about May 11, 2011, when the fraudulent effort to oust GG and JB failed, WALKER resigned from Bixby.

**May 2011 through August 20, 2013**

49.     Between May 11, 2011 and in or about August 2013, during which time WALKER was neither a director nor an officer of Bixby, WALKER continued the fraud scheme by repeatedly providing materially false information to certain of Bixby's victim/investors intending to lull them into believing that Bixby's difficulties arose, not out of WALKER's embezzlement from Bixby or out of his myriad lies about the efficacy of its

technology, but rather out of bad acts perpetrated by others with which WALKER was not involved and of which WALKER was not aware at the time of their occurrence.

50.     As a result of the scheme alleged above, the persons WALKER and his accomplices tricked into investing in Bixby sustained actual losses exceeding $57 million.

### COUNTS 1-4
(Mail Fraud)
18 U.S.C. § 1341

51.     The Grand Jury hereby re-alleges and incorporates paragraphs 1 through 450of this Third Superseding Indictment as though fully restated herein for the purpose of alleging the substantive mail fraud counts set forth below.

52.     For the purpose of executing and attempting to execute the scheme and artifice described above, the defendant knowingly caused to be sent, delivered, and moved by the United States Postal Service and interstate commercial carrier various mailings, items and things, as described below:

| COUNT | DATE (on or about) | MAILING |
|---|---|---|
| 1 | August 27, 2008 | $24,000 investment check payment mailed by E.B. from Quincy, Washington to Bixby Energy Systems Inc., Ramsey, MN |
| 2 | September 19, 2008 | Document Styled "Receipt of Shares and Acknowledgment" mailed from Bixby Energy Systems, Inc., Ramsey, MN to E.B., Quincy, WA |
| 3 | June 22, 2009 | $15,000 investment check payment mailed by E.B. from Quincy, WA to Bixby Energy Systems, Inc., Ramsey, MN |

| 4 | December 22, 2009 | $87,500 investment check payment mailed by R.W. from Kirkland, WA to Bixby Energy Systems, Inc., Ramsey, MN and deposited into a bank account of MB, WALKER's daughter |
|---|---|---|

All in violation of Title 18 United States Code, Sections 1341 and 2.

## COUNTS 5-13
### (Wire Fraud)
### 18 U.S.C. § 1343

53.    The Grand Jury hereby re-alleges and incorporates paragraphs 1 through 50 of this Third Superseding Indictment for the purpose of alleging the substantive wire fraud counts set forth below.

54.    For the purpose of executing and attempting to execute the scheme and artifice described above, the defendant knowingly caused to be transmitted in interstate commerce numerous writings, signals and sounds, including the interstate wire communications described below:

| COUNT | DATE (on or about) | WIRE DETAILS |
|---|---|---|
| 5 | June 29, 2009 | Document Styled "Full Subscription Form for Warrant Exercise" for 15,000 shares of Bixby common stock faxed by E.B. from Quincy, WA to Bixby Energy Systems, Inc., Ramsey, MN |
| 6 | December 1, 2009 | Email correspondence between WALKER and victim-investor E.J. in which Walker falsely claims that Bixby had $12 billion in orders |

U.S. v. Robert Allen Walker                                    Criminal No. 11-381 (SRN/JJG)

| | | |
|---|---|---|
| 7 | January 2, 2010 | Email from WALKER to victim/investor H.T. falsely claiming that Bixby had $12 billion in orders; representing that the "hydrogen liquefaction system works better than we thought"; and representing that "I have done this before [at Select Comfort] and I will do it again." |
| 8 | June 28, 2010 | Issuance to the public of a press release falsely stating that Bixby had successfully developed and had commercially available a "revolutionary process that efficiently converts coal into clean burning energy" |
| 9 | November 3, 2010 | $100,000 wire by E.B. from Quincy, WA to Bixby Energy Systems, Inc., Crown Bank, account #xxx9605, Minneapolis, MN |
| 10 | May 18, 2010 | WALKER email correspondence with victim-investor L.L. regarding investment in Bixby |
| 11 | April 25, 2011 | Fax sent by attorney P.D. from Minnesota to the Delaware Division of Corporations to authorize $100,000,000 in Bixby Class C Preferred Shares for the purported entity, Manna Assets Management, Inc. |
| 12 | August 9, 2012 | Email from WALKER to C.N. falsely representing that the video referred to in paragraph 37 above was intended to be shown to "prospective power plants" and that its falsity was the result of "R.B. and D.H. flim flamming all of us." |

U.S. v. Robert Allen Walker                                    Criminal No. 11-381 (SRN/JJG)

| | | |
|---|---|---|
| | | Email from WALKER to P.G. and P.K. falsely representing that an individual named B.K. pledged $100 million to Bixby "when Manna withdrew their investment." |
| 13 | September 24, 2012 | |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT 14
(Conspiracy to Commit Mail and Wire Fraud)
18 U.S.C. § 1349

55.     The grand jury realleges and incorporates by reference the allegations stated in paragraphs 1 through 50 of this Third Superseding Indictment for the purpose of alleging the conspiracy count set forth below.

56.     From in or about 2001 through in or about 2011, in the State and District of Minnesota, the defendant,

### ROBERT ALLEN WALKER,

did knowingly combine, conspire and agree with Dennis Desender and other persons known and unknown to the Grand Jury to commit the offenses of mail fraud and wire fraud against the United States by engaging in a scheme and artifice to defraud approximately 1,800 investors located throughout the United States by inducing them to invest approximately $57 million in Bixby by making repeated, false and misleading material representations of fact regarding the business of Bixby and by concealing from

24

the investors that a substantial portion of the money raised was used to enrich the

conspirators, and by causing the transmission in interstate commerce, by means of wire

communications, certain signals and sounds, for the purpose of executing such scheme

and artifice, and by causing the delivery by the United States Postal Service and interstate

commercial carrier of various mailings for the purpose of executing such scheme and

artifice.

All in violation of Title 18, United States Code, Section 1349.

## COUNT 15
(Witness Tampering)
18 U.S.C. § 1512(b)(1)

57.     The grand jury realleges and incorporates by reference the allegations

stated in paragraphs 1 through 50 of this Third Superseding Indictment for the purpose of

alleging the conspiracy count set forth below.

58.     On April 9, 2013, a United States Grand Jury issued a Second Superseding

Indictment in this matter alleging that WALKER defrauded GPU's clients, as alleged in

paragraph 44 above.

59.     GPU is a United States limited liability company with only 3 principals,

one of whom is J.W.

60.     Between July of 2009 and May 2011, WALKER engaged in extensive

communications with J.W. in J.W.'s capacity as a principal of GPU.   These

communications included extensive email traffic, in-person communications and phone

calls.   These communications were disclosed to WALKER by the United States as part

of its discovery obligations in this case, putting WALKER on notice that J.W. was likely

to be a witness for the United States at the trial of this matter.

61.     In or about May 2013, WALKER, working with two unwitting Bixby

shareholders, successfully installed S.N., a person with no prior experience in business as

an officer, director or executive of any kind, as the sole member of the Board of Directors

of Bixby.

62.     On or about May 22, 2013, J.W. sent an email to S.N. in S.N.'s capacity as

Bixby's sole board member inquiring whether Bixby had a plan to make GPU whole.

On June 7, 2013, S.N. forwarded the email to WALKER, opining that "some sort of

response is necessary."

63.     On or about June 10, 2013, in the State and District of Minnesota, the

defendant,

**ROBERT ALLEN WALKER**,

did knowingly engage in misleading conduct toward S.N. with the intent to influence the

testimony of J.W. in an official proceeding, namely, the trial of this matter scheduled to

begin on January 13, 2014 before the district court judge presiding over this matter, by

sending S.N. an email which he wrote in a manner intended to conceal his authorship of it

and make it appear that the email was written by S.N., knowing that S.N. would forward

the email to J.W., a witness for the United States in such official proceeding, which

falsely stated, among other things, that:

> I [S.N.] have been part of a team of shareholders who over the last two years conducted a comprehensive investigation into the activities of the company, compiling a huge amount of data as to what went wrong.   Our investigation disclosed that a huge fraud was being conducted by [S.A., R.B. and D.H.].

All in violation of Title 18, United States Code, Section 1512(b)(1).

## COUNT 16
### (Tax Evasion 2004)
### 26 U.S.C. § 7201

64.     During the calendar year 2004, defendant WALKER received kickback payments from Desender in the amount of $150,100, and upon said income there was owing to the United States of America income taxes exceeding $45,000.

65.     Well knowing and believing the facts set forth in the preceding paragraph, the defendant,

## ROBERT ALLEN WALKER,

in the State and District of Minnesota and elsewhere, did willfully attempt to evade and defeat the assessment of the income tax due and owing by him to the United States of America on such income by the following affirmative actions:

A.      On or about April 16, 2005, WALKER filed with the Internal Revenue Service a false and fraudulent United States Amended Income Tax Return, Form 1040X, on behalf of himself and his wife for the year 2004 (the "2004 Return"), wherein line 1 reported adjusted gross income of $174,189;   line 10 reported a total federal income tax

liability of $8,902; and line 22 claimed entitlement to a refund in the amount of $763; whereas, as he then and there well knew and believed, their adjusted gross income was substantially in excess of $174,189; a substantial tax was due and owing to the United States of America upon said additional adjusted gross income, and they were not entitled to any refund.

B.    WALKER failed to disclose, and, in fact, affirmatively concealed from the tax return preparer who prepared the 2004 Return, his receipt of the $150,100 in kickback payments during 2004, despite questions put to WALKER by the preparer designed to elicit information about such income.

C.    On or about March 28, 2007, when questioned by a revenue agent examining another taxpayer about the nature of the payments WALKER received from Desender, WALKER falsely claimed that the money WALKER received from Desender was a loan and showed the revenue agent a fictitious document purporting to substantiate his claim that the monies he received from Desender were pursuant to a "line of credit" with Desender.

D.    On or about March 28, 2007, WALKER provided the Internal Revenue Service with a fictitious loan agreement purportedly between WALKER, or borrower, and or entity owned by Desender as lender, which he created in 2006 but backdated to December 20, 2003, in order falsely to substantiate WALKER's bogus claim that the money he had received from Desender was proceeds of a loan.

All in violation of Title 26, United States Code, Section 7201.

## COUNT 17
(Tax Evasion 2005)
26 U.S.C. § 7201

66.     During the calendar year 2005, defendant WALKER received kickback payments from Desender in the amount of $255,606, and upon said income there was owing to the United States of America income taxes exceeding $79,000.

67.     Well knowing and believing the facts set forth in the preceding paragraph, the defendant,

**ROBERT ALLEN WALKER**,

in the State and District of Minnesota and elsewhere, did willfully attempt to evade and defeat the assessment of the income tax due and owing by him to the United States of America on such income by the following affirmative actions:

A.     On or about April 15, 2006, WALKER filed with the Internal Revenue Service a false and fraudulent United States Income Tax Return, Form 1040, for the year 2005 on behalf of himself and his wife (the "2005 Return"), wherein line 22 reported total income of $181,052; line 63 reported a total federal income tax liability for 2005 of $6,661, and line 72 claimed entitlement to a refund of $16,331, whereas, as he then and there well knew and believed, their total income substantially exceeded $181,052; a substantial tax was due and owing to the United States of America upon said additional taxable income, and they were not entitled to any refund.

29

B.      WALKER failed to disclose, and, in fact, affirmatively concealed from the tax return preparer who prepared the 2005 Return, his receipt of the $255,606 in kickback payments from Desender during 2005, despite questions put to WALKER by the preparer designed to elicit information about such income.

C.      On or about March 28, 2007, when questioned by a revenue agent examining another taxpayer about the nature of the payments WALKER received from Desender, WALKER falsely claimed that the money WALKER received from Desender was a loan and showed the revenue agent a fictitious document purporting to substantiate his claim that the monies he received from Desender during 2005 were pursuant to a "line of credit" with Desender.

D.      On or about March 28, 2007, WALKER provided the Internal Revenue Service with a fictitious loan agreement purportedly between WALKER, or borrower, and an entity owned by Desender as lender, which he created in 2006 but backdated to December 20, 2003, in order falsely to substantiate WALKER's bogus claim that the money he had received from Desender in 2005 was proceeds of a loan.

All in violation of Title 26, United States Code, Section 7201.

### COUNT 18
(Tax Evasion 2006)
26 U.S.C. § 7201

68.      During the calendar year 2006, defendant WALKER received kickback payments from Desender in the amount of $219,583, and upon said income there was

owing to the United States of America income taxes exceeding $74,000.

69.     Well knowing and believing the facts set forth in the preceding paragraph, the defendant,

## ROBERT ALLEN WALKER,

in the State and District of Minnesota and elsewhere, did willfully attempt to evade and defeat the assessment of the income tax due and owing by him to the United States of America on such income by the following affirmative actions:

A.     On or about April 15, 2007, WALKER filed with the Internal Revenue Service a false and fraudulent United States Income Tax Return, Form 1040, for the year 2006 on behalf of himself and his wife (the "2006 Return"), wherein line 22 reported total income of $192,314; line 63 (which amount was inadvertently printed in line 66a) reported a total federal income tax liability for 2006 of $17,315, and line 73 claimed entitlement to a refund of $10,421, whereas, as he then and there well knew and believed, their total income substantially exceeded of $192,314; a substantial tax was due and owing to the United States of America upon said additional taxable income, and they were not entitled to any refund.

B.     WALKER failed to disclose, and, in fact, affirmatively concealed from the tax return preparer who prepared the 2006 Return, his receipt of the $219,583 in kickback payments from Desender during 2006, despite questions put to WALKER by the preparer designed to elicit information about such income.

31

C.     On or about March 28, 2007, when questioned by a revenue agent examining another taxpayer about the nature of the payments WALKER received from Desender in 2006, WALKER falsely claimed that the money WALKER received from Desender was a loan and showed the revenue agent a fictitious document purporting to substantiate his claim that the monies he received from Desender during 2006 were pursuant to a "line of credit" with Desender.

D.     On or about March 28, 2007, WALKER provided the Internal Revenue Service with a fictitious loan agreement purportedly between WALKER, as borrower, and an entity owned by Desender, as lender, which he created in 2006 but backdated to December 20, 2003, in order falsely to substantiate WALKER's bogus claim that the money he had received from Desender in 2006 was proceeds of a loan.

All in violation of Title 26, United States Code, Section 7201.

## FORFEITURE ALLEGATIONS

70.     Counts 1 through 14 of this Third Superseding Indictment are hereby re-alleged and incorporated as if fully set forth herein by reference, for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

71.     As the result of the offenses alleged in Counts 1 through 14 of this Third Superseding Indictment, the defendant,

**ROBERT ALLEN WALKER,**

<u>U.S. v. Robert Allen Walker</u>                                      <u>Criminal No. 11-381 (SRN/JJG)</u>

shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the violations alleged in Counts 1 through 14 of this Superseding Indictment.

72.     If any of the above-described forfeitable property is unavailable for forfeiture, the United States intends to seek the forfeiture of substitute property as provided for in Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

A TRUE BILL

_____          _____
ACTING UNITED STATES ATTORNEY          FOREPERSON